MARGARET ELAINE HALLADAY, *p.a.* v. GEORGE T. INGRAM.

AUGUST 1, 1951.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

CONDON, J. This is an action of trespass on the case for negligence which was tried before a justice of the superior court without a jury and resulted in a decision for the plaintiff in the sum of $2,000. Defendant excepted thereto and has brought the case here by his bill of exceptions containing that exception and eleven others to rulings of the trial justice on the admission of evidence during the trial. Three of the latter exceptions have been expressly waived.

Plaintiff was injured on July 21, 1949 while she was being carried as a passenger in a bus belonging to defendant. At the time of the accident the bus was being operated by Charles A. Andrews, a counselor at the Juniper Trail Day Camp which was owned and conducted by Mr. and Mrs. Otto T. Gilmore. Plaintiff, aged seven, was a member of that camp and was on her way thereto from her home in Providence when the bus collided with the rear of a parked truck belonging to a third person not involved in this litigation. The trial justice found that the operator was clearly negli-

gent and that such negligence was the proximate cause of the accident. He also found on all the evidence that Andrews, as operator of the bus, was the servant or agent of the defendant. He announced his decision from the bench at the conclusion of the trial on December 5, 1950.

There is no controversy as to the operator's negligence having been the proximate cause of plaintiff's injuries. Defendant's principal contention on the issue of liability is that he bailed the bus to the Gilmores for use in their business by them or their servants or agents, and that their own camp counselor Andrews was such servant or agent over whom defendant had no control. The evidence on that question is sharply conflicting. The Gilmores, testifying by deposition, said that they did not hire the bus from defendant but that originally, by a written agreement entered into between them in 1940, he agreed for a stipulated price to transport children to the camp. They further testified that each succeeding year thereafter the agreement was renewed in the same terms excepting only a variation in the price of the service. That agreement was introduced in evidence as an exhibit and reads as follows:

"June 29, 1940

Transportation Agreement between Mr. George T. Ingram, 1608 Hope Street, Bristol, R. I. and Beach Farm Day Camp, Mrs. O. T. Gilmore, Director, Bristol, R. I. for transporting children and counselors from Providence and other points en route to camp in Bristol and return.

We hereby enter into an agreement and contract by which I, George T. Ingram agree to furnish transportation for children of Providence and points en route to and from the camp of Mrs. O. T. Gilmore off Metacom Avenue, Bristol one bus load from Providence each morning and one bus load from the camp in Bristol each afternoon on 5 days (Monday through Friday) of eight weeks July 1 to Aug. 23, 1940, and for same services I, Mildred Young Gilmore, agree to pay $135. for this period of 1940, to be paid as follows:

$50. by July 10, 1940;
$50. by July 31, 1940;
$35. by Aug. 20, 1940

plus gasoline charges and furthermore through George T. Ingram to pay for the bus driver.

(Signed) George T. Ingram
George T. Ingram
(Signed) Mildred Y. Gilmore
(Mrs. O. T. Gilmore)"

The Gilmores testified positively that defendant was to have control over the bus and that they had not hired or chartered it. Their testimony was also substantially to the effect that defendant had selected Andrews to operate the bus after he, the defendant, had personally satisfied himself that Andrews was competent to do so.

The defendant testified that he did not remember entering into the written agreement in 1940 but he admitted that the signature on the agreement was his. He was not clear as to what the precise arrangement was concerning the hiring of Andrews to drive the bus. He conceded, however, that he first satisfied himself that Andrews was competent to operate the bus before he permitted him to do so. Nevertheless he insisted that thereafter he had no control over the bus or the driver because the Gilmores had hired it.

We cannot recount all of defendant's testimony here, but as we read it in the transcript it appeared to us that there was some justification for the trial justice to characterize it as "very unreliable." In any event it is lacking in clearness and definiteness on the essential elements of the issue as to whether the responsibility for the acts of Andrews, solely in the operation of the bus, rested upon defendant or the Gilmores. Hence we cannot fairly say that the trial justice erred in his estimate of defendant as an unreliable witness concerning his agreement with the Gilmores.

In respect to appraising the credibility of the witnesses the trial justice was of course in a more advantageous position than we are, and he has concluded to accept as true the

testimony of the Gilmores that they had not hired the bus but had entered into an agreement with the defendant for transportation of the children to the camp by him. After carefully reading the transcript we cannot say the trial justice was clearly wrong in so finding.

Under his exception to the decision defendant makes a further contention that the damages awarded are grossly excessive. The plaintiff argues in reply that she has a serious facial disfigurement as well as a displaced or crooked tooth resulting from the accident and that when these facts are taken into consideration, in addition to her nervousness and sleeplessness resulting from the shock of the accident, the award of $2,000 appears fair and reasonable compensation.

In our view of the evidence plaintiff, aside from some permanent but slight facial disfigurement, suffered only minor physical injuries. Her own physician testified that she was "highly nervous" and "quite excited" when she was admitted to the hospital, but that her general condition was good. She had a laceration on the skin of her upper lip one quarter of an inch in length, and another one-half inch in length on the upper lip to the right of the midline, partly on the skin and partly on the mucous membrane. There was also a laceration inside of about the same length and her right incisor tooth was loosened and crooked. One suture was taken in the half-inch laceration near the midline of the lip, and the stitch was removed three days later. All lacerations healed without infection in seven days. After treatment at the hospital plaintiff was sent home the same day. She continued to be nervous for several weeks, but after three months she was, in the opinion of her physician, "fairly near normal." He also testified that the scars from the lacerations were red for some time and then began to fade. At the time of the trial in the superior court the quarter-inch scar was, according to his testimony, "fairly inconspicuous" and the one-half inch scar was "well healed, slightly depressed and is still noticeable." He admitted it would

become more inconspicuous as she grows older but would always be noticeable.

Two other physicians examined the plaintiff and testified on behalf of the defendant. One, a specialist in skin diseases, said it was necessary to get very close to plaintiff to notice the scars. He testified that changes in the skin were apparent to him only when he was six inches away from her; that the scars were "minor"; that they were very "flat, free and friable"; that "a very splendid cosmetic result" had been obtained; and that it required close examination by him before he could see anything wrong with her skin. He further testified that the scar would not get worse and that in his opinion he could not see how she could be handicapped by such a minute scar on her lip.

The other physician testified that upon examination he saw two rather faint scars on plaintiff's upper lip, "not at all conspicuous"; and he further testified that they would become "less conspicuous" as plaintiff grows older. He said that in his opinion the treatment she had received had produced a "cosmetic effect which is excellent" and that it would become "increasingly better." He conceded that when plaintiff smiles a depression is apparent but when her face is immobile you do not see it. He also testified that the "result is magnificent" and that while the scar will remain, changes in it due to the weather would vanish by the end of the winter, that is, 1950-1951.

Plaintiff's teacher in the public schools was called by defendant. She testified that plaintiff had been her pupil since February 1950; that she came in close contact with her pupils; that she had never noticed anything about plaintiff's upper lip; and that since she was summoned to testify she had observed plaintiff but had not noticed any mark on her upper lip. She admitted on cross-examination that she did not look closely. She testified further that she does not know whether the marks are there or not.

We are of the opinion that the evidence shows that there

470

is some permanent disfigurement of plaintiff's face due to the scar from the laceration which was sutured, but we also think that the great weight of the evidence shows that such disfigurement is at present slight and will diminish still further until it becomes scarcely noticeable except from searching scrutiny of her face.

It is clear that there is now no physical pain and suffering that can be attributed to plaintiff's lacerations. There has been some suggestion that there is and will be mental suffering therefrom because of a sense of shame or humiliation resulting from consciousness of the disfiguring marks. In this state such suffering is not an element of damage. But the actual disfigurement if reasonably connected with evidence of pecuniary loss is compensable. *Godfrey* v. *United Electric Rys.*, 70 R. I. 244. There is no evidence here of any such loss presently or evidence of a reasonable probability of such loss in the future. Moreover, the scars are so minor in character that there is no likelihood that in the future they will ever result in any special damages to the plaintiff. However, their presence is an element of damage in and of itself and like a mutilated member the permanently scarred lip may be taken into consideration along with plaintiff's other injuries in assessing damages therefor.

In the light of the foregoing observations we are clearly of the opinion that an award of $2,000 must have been predicated in large part upon the supposed mental suffering which plaintiff might undergo in the future because of such scars on her face. In that respect the damages are grossly excessive and if we eliminate consideration of that element they should be substantially reduced. We are naturally more reluctant to disturb an award of damages by a trial justice than one by a jury but in the present instance we must do so in the interest of substantial justice between the parties. It seems to us that for all the injuries which plaintiff suffered including nervousness, sleeplessness, a loosened and crooked tooth, the lacerations, the resulting scars such as they are,

and the consequent pain and suffering, the sum of $1,200 would amply compensate the plaintiff and be reasonably fair to the defendant. It is to be noted that neither the past expense of treating the plaintiff for her injuries nor the probable future expense of straightening her tooth is included in the above award, as such expenses are parental obligations which are not involved in the instant action.

The defendant has argued and briefed eight other exceptions with reference to the admission of certain evidence, but upon considering the transcript exclusive of such evidence thus excepted to we are of the opinion that its admission, assuming without deciding that it was erroneous, was not prejudicial to the defendant. These exceptions are overruled.

The defendant's exception to the trial justice's decision is sustained, and the case is remitted to the superior court for a new trial unless the plaintiff shall, on or before August 15, 1951, file in the office of the clerk of the superior court a remittitur of all of the decision in excess of $1,200. If such remittitur is filed, the superior court is ordered to enter judgment on the decision as reduced by the remittitur.

*Charles H. Eden*, for plaintiff.

*Carroll & Dwyer, Edward F. J. Dwyer,* for defendant.