DECISION
This case was tried before the Court, jury-waived. Mr. Blais alleges that he was assaulted and injured by Mr. King and Mr. Doble, and that Mr. and Ms. . King were negligent in causing his injuries.[1]
 FINDINGS OF FACT
On March 31, 2001 Elizabeth (Bishop) King and Joshua King were married. After the ceremony and reception, a party was hosted by the newlyweds at their small home on Old Baptist Road in North Kingstown. Mr. King, serving liquor, charged $5.00 for admission. A cup was supplied with admission for an unlimited supply of refreshments. Liquor flowed generously. Approximately 50 people attended the event, with many coming and going throughout the evening. Both of the Kings' knew there was heavy drinking, and minors were drinking at their home. *Page 2 
Jeffrey Blais was not invited to the event, but formal invitations were not required. He learned of the party from his sister Michelle Blais, who accompanied him to the event. Both were admitted by Mr. King. Mrs. King also accepted them to the event.[2] Immediately upon his arrival, Mr. Blais made his way to the kegs on the deck where he stayed for several hours.
By midnight, Mr. Blais was well intoxicated, as were many others at the party. Mr. Blais staggered at a campfire, fell onto a fence outside and against a wall inside. He became crass and obnoxious particularly to those who criticized his behavior. He swore liberally. Though many of the partygoers recognized that he was unfit to drive, no one arranged a ride for him. Michelle Blais and several others were making jello-shots with vodka in the kitchen.
As Mr. Blais became more unruly, Steven Doble encouraged Mr. Blais[3] to join him and others in the living room. Mr. and Mrs. King went to their bedroom for several hours, insisting that the others quiet down. Mr. Blais stopped drinking. Michelle Blais then separated from her brother. As the morning wore on, Mr. Blais attempted to leave; and Mr. Doble refused to allow him to leave the home.
At about 6 a.m., Mr. Blais noticed his sister and convinced her of the need to leave. They dashed for the car which was parked across the road. Mr. Doble and others gave chase, catching Mr. Blais in the middle of the street. While two men held Mr. Blais, Mr. Doble punched him and delivered a `soccer kick' after Mr. Blais had fallen to the ground. Mr. King also punched Mr. Blais. Each of the men punched Mr. Blais at least *Page 3 
three times. Mr. Blais never threw a punch, nor was he able to fight back. Mr. Doble admitted that he struck Mr. Blais claiming that Mr. Blais had upset him by threatening women in the house.
Knowing none of these individuals, Ms. Maynard happened to be driving down Old Baptist Road that morning. Alone in her car, she witnessed the beating clearly; and stopped her vehicle. Mr. King came to her door, and asked her to open the door. She refused, but heard Mr. King state "don't believe anything he [Mr. Blais] said". Mr. Blais was pleading for assistance, and Ms. Maynard telephoned the police.
Mr. Blais was stuck in the head, and suffered a concussion. His face was significantly bruised with bleeding in his eyes. He suffered a cervical strain to this neck, a fractured wrist, and migraine headaches. He treated with an ophthalmologist, a neurologist for five months, and orthopedic specialists for 14 months. He received extensive therapy. The medical bills totaled $8549.16.
Mr. Blais was reluctant to lose time at his new employment, Electric Boat. Even though his hand was in a cast, he attempted to work until he was released by his employer.
 CREDIBILITY OF THE WITNESSES
The sequestered witnesses in this case contradicted each other, and themselves, at every turn. Even though the parties heard all of the testimony, their testimony was also inconsistent. Nevertheless, the Court is convinced of the facts set forth above. In the midst of all of the contradictions, the Court is thankful for the testimony of Ms. Maynard.
Ms. Maynard happened upon the horrendous event when she was going out for breakfast food for her children. She knew none of the witnesses or parties, and clearly *Page 4 
felt threatened. Nevertheless, she presented herself clearly to the Court identifying the participants and their roles, and diagramming their locations. She was clear, thorough, rational, consistent, firm and highly credible.
While Jeffrey Blais' testimony was consistent with the testimony of Ms. Maynard, there was no corroboration of what occurred inside the house. The medical reports and photographs substantiate the extent of his injuries. His testimony is questionable in other respects, but nothing justified the physical attack upon him as he ran to his car to escape. The testimony of Michelle Blais was also of limited credibility, but her testimony was not needed for the strength of plaintiff's case.
Steven Doble admits that he struck Mr. Blais in the face, and Mr. Blais never attempted to fight back. He denied having a gun, or holding Mr. Blais on the couch. He added little, and did not deny liability or damages. Perhaps the sole reason why he appeared, testified, and sought to vacate a default, was to assist Mr. King for whom Mr. Doble served as best man.[4] His demeanor and responses minimized his credibility in his vouching for the newlyweds.
Mr. and Mrs. King were inconsistent with each other even though they attended all of the testimony. Their testimony was self-serving, and not credible. Mrs. King's testimony that her husband never told her what was occurring or that she never looked out the window was not credible, particularly when her husband testified that she alerted him to the noise, and he told her what was going on when he returned for his clothing. She was uncooperative on cross-examination and denied knowledge of her brother's birthdate. *Page 5 
Mr. King's testimony was inconsistent with his deposition. Mr. King's testimony on plaintiff's case that he did not go outside until the police arrived was inconsistent with the highly credible testimony of Ms. Maynard, and that of other witnesses. It is also irrational that he would emerge only after the noise concluded.
Ms. Debra Golding lived next door to the King home. She testified that she was feeding her child as she heard the screaming, and she then went to the window. She admitted that several men came off the porch to fight with Mr. Blais, but Joshua King did not get involved until the fight had moved into the street. Although Ms. Golding had then moved from her window, she sought to limit Joshua's involvement. Her testimony was inconsistent with the others as she claimed several other males were involved in the quarrels, and the severity of the fights were minimal. Ms. Golding also claimed that Jeffrey and Michelle Blais were the protagonists, provoking the fights by arguing with the others. Ms. Golding had limited memory as to whether Mr. Blais went to the ground (inconsistent with her deposition), but firmly defined Mr. King's limited involvement. She was highly defensive on cross-examination. She was clearly friendly with the Bishops and with the Kings at the time of the trial. She discussed the events with them pretrial stopping by the defense table as she exited the room. Accordingly, the Court discounts her testimony significantly.
Joseph Bishop and Michael Bishop are brothers of Mrs. King. Joseph attempted to control the questions he was asked, and avoided questions on the extent of drinking by others in attendance. His testimony was of little credibility and little import as he left the house before midnight. Michael Bishop's testimony was of low credibility. He focused on the extent of Mr. Blais' intoxication, but claims he was not in the living room after *Page 6 
midnight. He even denied that Mr. Doble struck Mr. Blais although Mr. Doble admitted it. His testimony was not credible.
 LIABILITY
The first count in the complaint alleges Mr. and Mrs. King were negligent. Generally, negligence is the failure of one person, acting in a given set of circumstances, to exercise that degree of care for the safety for another person that a reasonably prudent person would ordinarily exercise in the same or similar circumstances. Montuori v.Narragansett Electric Co., 418 A.2d 5 (1980).
As the hosts, Mr. and Mrs. King had a duty of care for their guests, including Mr. Blais. They breached that duty by allowing excessive drinking, quarrels through the night, fights on the lawn, and Mr. King's participation in the fight. Their knowledge of the events of the evening and their ability to control the premises underscore their significant duties:
 [A]s a general proposition, each possessor of land owes to those outside the premises a duty to use reasonable care to prevent them from being injured as a result of activities on their property. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 57 at 387 (5th ed. 1984). This duty extends to activities conducted by third parties on the possessor's property if the possessor has the power to control such activities. Id . at 392. Volpe v. Gallagher 821 A.2d 699, 705 (R.I. 2003)
Mr. and Mrs. King had a legal duty to Mr. Blais which they breached. This breach proximately caused the injuries to Mr. Blais. The Court finds that Mr. and Mrs. King are each liable in negligence to Mr. Blais. *Page 7 
The second count alleges assault and criminal behavior by Mr. Doble. Mr. Doble admits that he struck Mr. Blais. An assault is a physical act of a threatening nature that puts an individual in reasonable fear of imminent bodily harm. It is the plaintiff's apprehension of injury that renders the defendant's act compensable. Proffitt v. Ricci, 463 A.2d 514
(R.I. 1983); Webbier v. Thoroughbred Racing Protective Bureau,Inc., 105 R.I. 605, 254 A.2d 285 (1969). In order to constitute a battery, a person must intend to cause the offensive contact or unconsented touching of another person. Proffitt v. Ricci, 463 A.2d 514
(R.I. 1983).
The second count also claims liability for Mr. Doble's criminal behavior. A Rhode Island statute states:
 § 9-1-2. Civil liability for crimes and offenses. — Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made . . . G.L. 1956, § 9-1-2.
Mr. Doble's s conduct amounted to criminal conduct per G.L. § 11-5-3. Mr. Doble is liable for his assault on Mr. Blais, and his criminal conduct.
The third count sounds against Mr. and Mrs. Doe. It was not pressed at trial, and is therefore dismissed.
The fourth count alleges that Joshua King committed an assault. As the Court has previously found that Mr. King struck Mr. Blais at least three times, an assault and a battery occurred.
The fifth count sounds against Mr. Joseph Bishop, Jr. which was not addressed at trial, and is therefore dismissed. *Page 8 
 COMPENSATORY DAMAGES
As neither the plaintiff nor the defendants' distinguished which of Mr. Blais's injuries were caused by which defendant, the Court is incapable of making a division. See Restatement (Second) of Torts, § 433A (1965), and Roberts-Robertson v. Lombardi, 598 A. 2d 1380 (R.I. 1991). As the defendants have not met their burden by submitting any proof of how to apportion the damages between them, the Court will decline to do so. Wilson v. Krasnoff, 560 A.2d 335 (R.I. 1989).
Damages are defined in law as the amount of money that will compensate an injured party for the harm or loss that he has sustained. The Court finds that the sum of $8,549.16 for Mr. Blais' medical expenses were medically reasonable and necessary to his proper care and treatment. These treatments were necessary as a result of the injuries that Mr. Blais received from the assault.
Mr. Blais is also entitled to the wages he lost as a result of the assault. The uncontradicted evidence is that he incurred eight weeks of lost wages for a total of $3200.
Additional damages are appropriate for any pain and suffering of Mr. Blais. Pain means physical pain, the kind resulting from a physical impact or injury. It includes what we ordinarily think of as physical pain as well as discomfort, stiffness, and restriction of bodily motion that is caused by the pain or discomfort brought about by moving. Suffering means recognizing the pain, the danger resulting from the pain, the knowledge that the pain and treatment for it will continue.Arlan v. Cervini, 478 A.2d 976 (R.I. 1984).
The uncontradicted testimony of Mr. Blais establishes that he went unconscious after the second punch, and awoke in the middle of the road. He was "very scared for his *Page 9 
life", and "overwhelmed". During the next few days, his left eye was red from bleeding and bruised. The right eye was black and blue. His neck, eyes, face and chest were all in pain. He had migraines. His eye stayed red for at least six weeks. His wrist was in pain when he arrived at work, and he was "harassed" and "called cupcake" at work. In July, a wrist fracture was discovered; and he was placed in a cast. His thumb was then placed in a splint for 2 weeks. The migraine headaches continued into August, and he underwent physical therapy treatments. He awoke with nightmares of the events, particularly during the first few weeks. The amount of his pain was substantial. The extent of his suffering, continuing over a year, was significant.
Based on the testimony and other evidence presented, the Court awards damages for pain and suffering as follows:
 • For April 1 and 2, 2001, Mr. Blais was in extreme pain, anguish and humiliation; and is awarded a subtotal of $3000.
 • For April 3, 2001, through October 24, 2001, he suffered significant pain, underwent physical therapy and treatment by a neurologist and orthopedic surgeons. He is awarded $350.00 per week for these 26 weeks of pain and suffering for a subtotal of $9100.
 • For the period of October 25, 2001 through June 23, 2002, Mr. Blais continued to have pain, suffering, and treatment for his wrist. He is awarded $100.00 per week for these 34.5 weeks for a subtotal of $3450.
Damages for pain and suffering are, therefore, $15,550.
 The total compensatory damages are $27,299.16. *Page 10 
 PUNITIVE DAMAGES
Punitive damages are intended to punish a party whose wrongful conduct was malicious or similar extreme conduct. They are awarded only if a defendant has acted with malice, wantonness, or willfulness of such an extreme nature as to amount to criminality which, for the good of society and as a warning to individuals, ought to be punished.Palmisano v. Toth, 624 A.2d 314, 318 (R.I. 1993). Mr. Doble acknowledges that he punched Mr. Blais essentially admitting an intentional tort. The Court has found that Mr. King assaulted Mr. Blais as well. Such violent conduct was, obviously, committed with extreme recklessness or intent. If not criminal acts, their extreme nature amounts to criminality. The beating was obviously malicious. These acts are the type of acts for which punitive damages were intended. An award of punitive damages here will foster deterrence and impose appropriate punishment.
A defendant's wealth is an important factor in determining the amount of punitive damages. The damages must reasonably relate to:
 a) the character and degree of defendant's wrongful conduct;
 b) the amount of compensatory damages awarded;
 c) the impact of the punitive damages on third parties.
BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996); Pacific MutualLife Insurance Co. v. Haship, 499 U.S. 1 (1991); Emery-Waterhouse Co. v.Rhode Island Hospital Trust National Bank, 757 F.2d 399, 410
(1st Cir. 1985).
While the plaintiff must establish proof for the imposition of punitive damages, the plaintiff need not establish the wealth of the defendant, as case law explains:
 We reject defendant's contention that a plaintiff should be required to present a threshold amount of evidence about a defendant's financial status *Page 11 
as a condition precedent to an award of punitive damages or that a plaintiff's failure to offer such evidence precludes the need for the defendant to mitigate the damages with his own presentation of evidence. It is true that it is plaintiff's burden to both prove the elements of his civil claim and to demonstrate to the fact-finder that defendant's actions should be punished through exemplary damages. However, our law does not require a further demonstration of the depth of the reservoir from which resources could be drawn to satisfy a punitive damage award. . . . Rhode Island decisional law is clear on this issue and we decline defendant's invitation to change it. See Greater Providence Deposit Corp. v. Jenison, 485 A.2d 1242
(R.I. 1984).
 * * * If adequate facts are presented, the fact-finder must decide whether a plaintiff is entitled to such an award. Jenison, 485 A.2d at 1244. Although a defendant's ability to pay may well play a role in the jury's estimation of the amount of damages to award, see Palmisano, 624 A.2d at 318, a punitive award is no per se void because such evidence is not present.
 * * * In fact, our cases hold that it is the defendant who has an affirmative obligation to present evidence of financial condition if he hopes to lessen a potential award. . . . By not coming forward with evidence of his financial means, defendant either took a risk or made a tactical decision that did not bear fruit. Castellucci v. Battista, 847 A.2d 243, 246-8
(R.I. 2004)
Mr. Blais met his burden of proof. The defendants' committed violent, physical beatings of Mr. Blais, first while his hands were held behind him, and then after he fell to the ground. He was punched, kicked and maimed. These acts are extreme, were obviously committed with malice and intent, and are deserving of significant punishment. An award of punitive damages will not only punish but will deter defendants and others in society from committing similar violent attacks. Little is known about the defendants' wealth or income.
Accordingly, punitive damages of $10,000 are awarded to Mr. Blais against Mr. King. As Mr. Doble had been involved in other fights before, punitive damages of $12,000 are awarded to Mr. Blais against Mr. Doble. *Page 12 
 CONCLUSION
Judgment is awarded to Mr. Blais against Mr. and Mrs. King on count one. Judgment is awarded to Mr. Blais against Mr. Doble on count two. Count three is dismissed. Judgment is awarded to Mr. Blais against Mr. King on count four. Count five is dismissed. Compensatory damages of $27,299.16 are awarded to Mr. Blais to be paid by the defendants, Mr. King, Mrs. King and Mr. Doble jointly and severally. Prejudgment interest, postjudgment interest and costs are awarded to Mr. Blais.
Separate awards of punitive damages are awarded. Punitive damages of $10,000 are awarded to Mr. Blais to be paid by Mr. King. Punitive damages of $12,000 are awarded to Mr. Blais to be paid by Mr. Doble.
Plaintiff's counsel shall submit a Final Judgment within ten days of this Decision.
[1] While Mr. Doble was previously in default, the default was vacated by agreement; and the entire case proceeded to trial on the merits. Mr. Doble claims in his memorandum that he was not timely served, but references no authority to limit the court's jurisdiction. He raised no such affirmative defense, nor did he demonstrate how the delay affected his defense. Finally, he did not establish that the delay was caused by the plaintiff.
[2] See stipulation of June 27, 2008.
[3] Mr. Blais claims that he was held against his will on the couch for several hours, after he noticed Mr. Doble had a gun. As his testimony is inconsistent with others (no one else testified to a gun), and false imprisonment is not alleged; the Court does not need to make such specific findings.
[4] Though Mr. Doble represented himself at trial, a post-trial memorandum was submitted on his behalf by the counsel for Mr. and Mrs. King. *Page 1