DECISION
The defendants have filed motions for summary judgment. After hearing on the motions, this justice took the matter under advisement.
This medical malpractice action arises out of the death of a fetus that died in utero due to a prolapsed cord. The plaintiffs, Donna and Antonio Fortes (Fortes) allege that the physicians were negligent when they failed to diagnose Donna Fortes's incompetent cervix and to perform a cerclage procedure that plaintiffs contend would have prevented the fetus' premature delivery and death. This was Donna Fortes's third fetus to die in utero. The plaintiffs allege a breach of the duties of Donald A. Ramos, Fred A. Brosco, Broadway OB/GYN, and John Doe (defendants) owed to the mother, Donna Fortes, and to the fetus, Baby Girl Fortes, to properly diagnose and treat them. Donna and Antonio Fortes, the father, each has brought negligence-based claims for emotional distress. Donna Fortes has brought an alternative claim for bodily injury and for the mental suffering attendant to that bodily injury. The alternative nature of the claims seems, in part, a response to the questions surrounding the gestational period and the viability of the fetus — something that is hotly contested by the parties. Donna Fortes and Antonio Fortes, as the parents and legal beneficiaries of Baby Girl Fortes, have also brought claims under the Wrongful Death Act. See G.L. § 10-7-1, Liability for Damages for Causing Death. Specifically, they have brought claims for pecuniary damages and loss of consortium pursuant to G.L. § 10-7-1.1 and 2, Pecuniary Damages Persons Who May Bring Actions — Minimum Recovery Period.
In this motion for summary judgment, the defendants assume the plaintiffs' claims of medical malpractice to be true. For purposes of this motion, then, it is undisputed that the defendants were negligent and that their negligence resulted in bodily harm to the plaintiff Baby Girl Fortes or, assuming Baby Girl Fortes was not viable, to the plaintiff Donna Fortes, whose living tissue was destroyed as a result of the prolapse.
There are several aspects to the motion. Each claim is addressed separately below.
 I. The Wrongful Death Act
The defendants contend that plaintiffs cannot demonstrate that Baby Girl Fortes was a viable fetus at the time their negligence caused its death. They contend, therefore, that there has been no death of a "person" and, accordingly, no an action can lie under any of the various aspects of Rhode Island's wrongful death statute. As part of their objection, the plaintiffs argue that the defendants have not preserved non-viability as an affirmative defense under R.I. R.Civ. P. 8 (c) and 12(h).
Rule 8(c) provides: "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense." The first question arising under Rule 8(c) is whether the non-viability of the fetus is an affirmative defense in the context of the Wrongful Death Act. This justice agrees with the defendants that it is not.
An affirmative defense is one of avoidance rather than denial. In the Interest of C.M., et al, 996 S.W.2d 269, 270 (Tex.Ct.App. 1st Dist. 1999). It directly or implicity concedes the basic position of the plaintiff, but asserts that the plaintiff is not entitled to prevail because he or she is precluded for some other reason. Choice Hotels International, Inc. v. Madison Three, Inc., 83 F. Supp.2d 602, 603 (D.Md. 2000) (citing Maryland law); Accord Walsh v. West Valley Mission Community College District, 66 Cal.App.4th 1532 (1998) ("an affirmative defense is one which sets forth facts from which it results that, notwithstanding the truth of the allegations of the complaint, no cause of action existed in the plaintiff at the time the action was brought"). Because the Wrongful Death Act is a statutory remedy designed to allow recovery for the death of a person only, proof that the victim was a "person" is necessarily part of the plaintiffs' prima facie case. The complaint affirmatively asserted viability — and quite properly so, given that the viability of the fetus is essential to recovery. Miccolis v. AMICA Mutual Insurance Company et al, 587 A.2d 67, 71 (R.I. 1991). Defendants' present denial of that factual allegation is merely a denial of an element of the Forteses' prima facie case and therefore constitutes a general defense, not an affirmative one. For that reason, non-viability of the fetus need not have been plead in response to the complaint except as a general denial of fact or as something about which the defendant had no knowledge.
The next question is whether the defendants have, by their answers, admitted or denied viability. Fair readings of the defendants' answers shows that they denied knowledge of the fetus' viability and have left plaintiffs to their proof in this regard. Accordingly, this justice must proceed to address the merits of the questions raised by the fetus' viability or non-viability.
The Rhode Island Supreme Court has specifically held that a non-viable fetus is not a person for purposes of the Wrongful Death Act. Miccolis, 587 A.2d at 71. Thus the defendants are correct in their contention that if Baby Girl Fortes was not viable, then the Fortes cannot recover under the Act. The medical records, however, show conflicting information concerning the gestational period, and the plaintiffs have produced the affidavit of an expert physician who has opined that fetus was indeed viable. Because the plaintiffs have demonstrated there exists a genuine dispute about the question of viability, the motion must be denied insofar as it rests on these grounds. See Marchetti v. Parsons,638 A.2d 1047 (R.I. 1994); Woodland Manor III. Associates v. Keeney,713 A.2d 806 (R.I. 1998).
The defendants further contend that even if Baby Girl Fortes were viable, they are entitled to a partial judgment on any Wrongful Death Act claims other than those brought pursuant to G.L. 1956 § 10-7-1.1. The defendants point to G.L. 1956 §§ 10-7-2 and 7 as requiring the plaintiffs' claims to have been brought by an executor or administrator of Baby Girl Fortes' estate. It is undisputed that this action has not been brought by either of the Fortes as representative of the estate of Baby Girl Fortes.
A review of the operative complaint shows clearly that Donna and Antonio Fortes have brought the action as the parents and beneficiaries of Baby Girl Fortes and that the damages they claim are those contemplated by G.L. 1956 § 10-7-1.1 (pecuniary damages) and G.L. 1956 § 10-7-1.2 (loss of consortium). A review of the operative complaint shows also that the Fortes have not made any claim for medical expense and diminution of earning power recoverable under G.L. 1956 § 10-7-5, or for pain and suffering recoverable under G.L. 1956 § 10-7-7.
The rules of statutory construction are well settled. Statutes that are not inconsistent with each other and relate to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general object and scope. Berthiaume v. School Committee of Woonsocket, 397 A.2d 889, 893 (R.I. 1979). Where two apparently inconsistent provisions are contained in a statute, every effort should be made to construe and apply the provisions as consistent. Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire, 637 A.2d 1047 (R.I. 1994) (citing Brennan v. Kirby, 529 A.2d at 633 637 (R.I. 1987)). When G.L. 1956 §§ 10-7-2 and 3 are read together, it becomes apparent that where an estate has not been opened or if the administrator or executor has failed to bring a claim under the Wrongful Death Act, then the beneficiaries may bring a direct action and are entitled to those damages recoverable under both G.L. 1956 §§ 10-7-1.1
and 1.2, as well as the minimum recovery contained in a G.L. 1956 §10-7-2. Insofar as the motion for summary judgment rests on these grounds, the motion must be denied.
 II Negligence in the Death of a Fetus — Question Presented
The defendants also move for summary judgment on Donna Fortes's claims for thought-based suffering. Specifically, they move for summary judgment on her claim for the mental anguish caused by the bodily harm she experienced as a result of the prolapse, i.e. the loss of her fetus. They also move for summary judgment on her claim for negligent infliction of emotional distress. The reasoning behind the defendants' legal arguments has far-reaching implications.
It is undisputed that the emotional turmoil suffered by Donna Fortes when she lost the fetus did not result in medically established, objectively measurable physical symptoms. The defendants argue that they are entitled to summary judgment in the absence of evidence that the emotional harm suffered by Donna Fortes resulted in such symptoms. The defendants contend that Rhode Island's physical symptomatology requirement applies to all manner of claims for mental anguish including those in which the mental anguish is a consequence of a bodily injury or the invasion of a legal interest. They contend, therefore, that the physical symptomatology requirement should be applied to cases of death of a fetus by negligence regardless of whether the fetus was or was not viable at the time it was harmed and regardless of whether the claim is cast as one for bodily injury or as one for negligent infliction of emotional distress. In turn, the plaintiffs challenge the application of the physical symptomatology requirement to such cases. Thus, the question presented is whether Rhode Island's physical symptomatology requirement for emotional distress claims should be extended to those cases involving negligence in the death of a fetus.
 III. The Physical Symptomatology Requirement in Emotional Distress Claims — the Legal Background
No matter how claims for thought-based suffering are legally cast[1]
and regardless of whether the mental suffering is recognized by medical science as a diagnosable emotional disorder or something less, the degree or severity of distress caused to plaintiff will fall anywhere along the continuum that ranges from the more garden variety stress and apprehension routinely attendant to a temporary physical injury to the annoyance and aggravation associated with the loss of enjoyment of real estate; to the humiliation and embarrassment associated with post injury scarring; to the fear, grief, humiliation and worry caused by the loss of a limb, a serious civil rights violation or a false imprisonment; to the disabilities associated with a medically cognizable emotional or mental condition caused by a traumatic event as in Post Traumatic Stress Disorder. How this seemingly indecipherable spectrum of human mental processes is to be approached with consistency, as well as fairness, is a topic that has generated considerable controversy. The legal backdrop concerning thought-based suffering claims is appropriately set out at this juncture.
The requirement that psychic distress must result in physical symptoms is not universally applied in Rhode Island. In fact, in most cases Rhode Island law allows a plaintiff to recover for the mental anguish or psychic consequence of the harm caused by a defendant notwithstanding a lack of physical symptoms brought about by that emotional suffering. There are circumstances, however, in which the Court has limited recovery for thought-based suffering and has held that recovery may be had only where the psychic consequence of an actor's wrongful conduct results in some objectively measurable[2] physical effect. The Court has referred to the secondary physical effect resulting from the harm to the psyche as "physical symptomatology."
The policies driving the requirement of physical symptomatology are those of safeguarding against bogus or exaggerated emotional distress claims, Reilly v. U.S., 547 A.2d 894 (R.I. 1988), and of limiting legal liability such that it remains commensurate with principles of moral culpability. D'Ambra v. United States, 338 A.2d 524 (R.I. 1975); Marchetti, 638 A.2d at 1047. Indeed, physical symptomatology at times has been regarded by various jurisdictions as the appropriate overlay needed to substantiate that a plaintiff has truly suffered emotional distress as well as to impose outside parameters on
legal liability. Clift v. Narragansett Television, 688 A.2d 805 (R.I. 1996); see generally Volume 1 Matthew Bender, Negligent Emotional Distress: Objective Symptomatology Requirement, Damages in Tort Actions, § 5.03 [2][e] (1997). This is so regardless of the fact that medical science cannot objectively measure many genuine and medically supportable physical responses to emotional distress and regardless of the fact that mental health experts do not regard physical symptomatology to be a diagnostic criterion for a number of legitimate mental health disorders.[3] It is also thus despite the fact that the argument that psychic injuries alone are difficult to prove has been generally recognized as invalid.[4]
In determining whether the physical symptomatology overlay should be imposed upon a particular claim or type of case, courts have seemingly utilized what has emerged as an ad hoc approach to its application but one that is fundamentally driven by a reliability quotient. Regardless of the category in which the distress claims fall, courts dispense with the requirement of physical symptomatology depending upon the source of the mental suffering at issue, the perceived trustworthiness of the claim, the reliability of proof, the practical politics of legal versus moral culpability, and the degree of faith that the courts are willing to place in the trial court and the jury's ability to discern bogus or exaggerated claims.
For example, proof of physical symptomatology is not a necessity in cases where the plaintiff complains about the mental anguish caused by a physical injury to the body. See Arlan v. Cervini, 478 A.2d 976 (R.I. 1984) (and cases cited therein). Upon making a finding of liability, juries are routinely permitted to consider the entire gamut of emotional distress that results from the bodily injury regardless of whether that suffering is characterized as humiliation, discomfort, apprehension, aggravation, annoyance, anxiety, sadness, despair, grief, embarrassment, shock, fear, or anger, etc. And, juries routinely determine what is reasonable compensation for the different emotions that they find a plaintiff to have suffered based upon the trial evidence showing the quality and quantity of that suffering. The rationale, necessarily, must be that it is within the realm of ordinary human experience that a bodily injury victim will typically experience this kind of psychic discomfort, and that the jury is appropriately given the task of evaluating such harm. The negative mental effect of this more temporal, more tangible event — the bodily injury — is inherently obvious, is within the realm of lay experience, and is something for which expert opinion is not helpful and therefore not required.[5] There is no need to impose additional safeguards against bogus claims because the circumstances provide sufficient indicia of reliability and trustworthiness to support the claim for thought-based harm and jurors have the capacity to assess the appropriate measure of compensation that they should award for that harm. Furthermore, to compensate an individual for all the losses he or she has suffered as a consequence of another's liability for bodily injury is consistent with the fundamental premise of the common law system that one should have redress for every substantial wrong that is inflicted upon him or her as a result of another's wrongful conduct. DeSpirito v. Bristol Co. Water Co., 227 A.2d 782 (R.I. 1967); Arlan v. Cervini, 478 A.2d 976 (R.I. 1984); see, Battalla v. State of New York,176 N.E.2d 729 (N.Y. 1961); Bowman v. Williams, 165 A. 182 (Md. 1933). And, lastly, the emotional consequences of bodily injury are so reasonably foreseeable that imposing liability for such harm causes no affront to public policy.
Similarly, proof of physical symptomatology is not required where the mental suffering is caused by the invasion of a legal right. For example, when the claim is for the aggravation, annoyance, and stress that accompany the interference with one's possessory interest in real estate, the physical symptomatogy overlay is not applied. Hawkins v. Scituate Oil, 723 A.2d 771 (R.I. 1999). Likewise, a plaintiff in a civil rights action who has proven only an intangible loss of civil rights or purely mental distress may be awarded substantial compensatory damages without a showing of physical symptomatology. Magnett. v. Pelleteir,488 F.2d 33 (1st Cir. 1973). Presumably, such recovery is permitted because the requisite guarantee of trustworthiness or reliability is inherent in the facts and circumstances surrounding such losses — all of which are vulnerable to the scrutiny of today's sophisticated juries. Because the significance of one's legal rights and the invasion of those rights are within the realm of ordinary human understanding, the evidence concerning the nature and extent of the underlying invasion, if believed, carries sufficient circumstantial indicia that the claim is a reliable one such that it should be left to the fact finder to make an assessment of damages without the necessity of grafting onto the claim a requirement that physical symptoms accompany the mental turmoil. And, to compensate an individual for all the losses he or she has forseeably suffered as a consequence of being deprived of a lawful right is clearly consistent with public policy, obviating the need to place an outside limit on culpability for the emotional aspects of the deprivation — other than those inherent in a traditional forseeability and causality analysis.
Nor does the Court apply the physical symptomatology overlay in false imprisonment cases or cases of defamation per se. See Arlan, 478 A.2d at 976; Swerdlick v. Koch, 721 A.2d 849 (R.I. 1998); Bosler v. Sugarman,440 A.2d 129 (R.I. 1982); Webbier v. Thoroughbred Racing Protective Bureau, 254 A.2d 285, 105 R.I. 605 (R.I. 1969). Though most jurors will not have suffered either, the effects of both are within the range of ordinary human comprehension and imagination such that a jury can be trusted to make a proper assessment of the validity of the claim, as well as the nature and extent of the mental anguish visited upon the plaintiff. Just as importantly, public policy objectives are not discernibly impaired.
The instances in which Rhode Island has required a showing of physical symptomatology resulting from thought-based suffering have been limited to cases in which the claim was substantially a claim of "outrage" — Vallinoto v. DiSandro, 688 A.2d 830 (R.I. 1997); Clift, 688 A.2d at 805; Champlin v. Washington Trust Co. 478 A.2d 985 (R.I. 1984) — or in which the claim was a negligence-based bystander liability claim — D'Ambra, 338 A.2d at 524; Reilly, 547 A.2d at 894; Marchetti, 638 A.2d at 1047. Notably and in both of those types of cases, Rhode Island departs from the traditional rule or common law model in imposing its physical symptomatology overlay. Specifically, Rhode Island departs from the Restatement (Second) of Torts by requiring physical symptomatology in cases of "outrage." Restatement (Second) Torts § 46 (1965). It also departs from the common law model in applying the physical symptomatology overlay to bystander liability claims. Thing v. La Chusa, 771 P.2d 814 (Cal. 1989); Marchetti, 638 A.2d at 1047. As with the other jurisdictions that impose a requirement of physical symptomatology for such claims, the pertinent Rhode Island cases reveal the requirement to be driven by a fundamental mistrust of the trial court process, as well as by a genuine concern that outside limits should be placed on legal liability. Marchetti, 638 A.2d at 1047; Reilly, 547 A.2d at 894; D'Ambra, 338 A.2d at 524.
In intentional infliction of emotional distress cases where the elements of the claim, together with the circumstances of the case, inherently, provide the guarantee of genuineness, Rhode Island's departure from the Restatement (Second) of Torts seems baffling. Indeed, The Restatement (Second) Torts § 46 (1965) recognizes that the requirement of bodily harm or a physical symptomatology overlay is as unnecessary in intentional infliction of emotional distress claims as it is in cases where the emotional turmoil is a parasitic[6] element of damages. The rationale is that in cases of intentional infliction of emotional distress, questions of reliability of proof and scope of liability are resolved by the essential elements of the claim, causality requirements, burden and standard of proof, and the jury's innate ability to consider the trial evidence. Any physical symptoms of the mental distress are treated merely as circumstantial evidence in support of the validity of claim. Restatement (Second) Torts § 46 cmt. k (1965).
Furthermore, Rhode Island has long considered its juries to be sufficiently adroit to resolve thorny and multifaceted factual questions in cases involving complex legal issues. They are frequently asked do so without the benefit of any expertise except that which they are able to glean through the presentation of expert witnesses at trial — expert witnesses whose credibility they must simultaneously assess. Rhode Island juries are also routinely required to resolve questions concerning extreme conduct, that is, the malicious, near-criminal and extreme conduct warranting imposition of punitive damages. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 182 F.R.D. 386 (D.R.I. 1998); Palmisano v. Toth, 624 A.2d 314 (R.I. 1993); Scully v. Matarese, 422 A.2d 740
(R.I. 1980); T S Service Associates v. Crenson, 505 F. Supp. 938
(D.R.I. 1981) (vacated by T S Service Associates v. Crenson, 666 F.2d 722
(1st Cir. 1981)). And, finally, Rhode Island juries are routinely required to resolve questions concerning the legitimacy and severity of thought-based suffering in parasitic damage claims, including cases involving tragic injury and including cases of near-pure, thought-based distress, such as defamation, false imprisonment, and the like. Certainly, there is nothing in Rhode Island's legal history to suggest that once given an instruction on the appropriate standard of proof, causality, and cautionary considerations, a jury cannot properly determine whether the conduct at issue in an intentional infliction of emotional distress claim is so extreme[7] in degree that it can be said to be outrageous and to exceed all possible bounds of decency so as to be regarded as utterly intolerable in a civilized society[8] and whether the resulting mental turmoil is reasonable and justified under the circumstances or whether it is exaggerated or unreasonable.[9]
Just as importantly, the essential elements of a claim for intentional infliction of emotional distress respond adequately to public policy considerations by placing a limitation on the scope of liability. Furthermore, the trial court remains free to determine in first instance whether a defendant's conduct may reasonably be regarded as so extreme and outrageous so as to submit the question to the jury.[10]
Nevertheless, Rhode Island continues in its reliance upon physical symptomatology as a guarantee of the reliability of proof and as a limitation on liability in claims for outrage — as superfluous as that guarantee may be.
Where the claim is one for negligent infliction of emotional distress, Rhode Island has so far addressed legal liability only in the context of bystander cases and has generally followed a California-model bystander liability framework — one that is inspired by traditional common law considerations yet avoids open-ended liability by setting a minimum-severity threshold for the degree of harm needed to support liability. Marchetti, 638 A.2d at 1047; Thing, 771 P.2d at 814; Dillon v. Legg, 441 P.2d 912 (C.A. 1968). See also, Swerdlick, 721 A.2d at 864 (wherein the Rhode Island Supreme Court acknowledged its limited recognition of a claim based upon Restatement (Second) Torts § 313 (1965)). Nevertheless, Rhode Island departs from the California model by imposing the physical symptomatology requirement on bystander liability claims as the sine qua non of severe emotional distress. Marchetti, 638 A.2d at 1047; Reilly, 547 A.2d at 894. Grafting the physical symptomatology requirement onto such claims seems incalculably redundant given the objectives of the California model bystander liability foreseeability criteria — criteria that are joined with a sufficiently clear explanation concerning the quantum of harm necessary to support liability.
In general, bystander liability principles are the product of the same reliability-based approach employed in determining whether the physical symptomatology overlay should be applied. In the California model, however, questions of untrustworthiness and unreliability are resolved through the application of forseeability-based-end limitations and a public-policy-driven limitation on the severity of the distress suffered. In California-model cases, liability will lie only where (1) the stressful event was the death of or injury to a close family member of the plaintiff and (2) the event was temporally and spatially proximate to the plaintiff who was aware at the time that the event was causing harm to the victim and (3) as a result the plaintiff suffered serious emotional distress — a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances. See Thing, 771 P.2d at 814. In California-model claims, proof of physical symptomatology is additionally superfluous because the thought-based suffering claim has its genesis in what is generally accepted as a shocking or traumatic event. The facts and circumstances surrounding events such as those giving rise to liability will carry with them their own indicia of reliability. And, not only is the causal connection between the sadness, shock, grief, etc. something that a layperson-juror can fairly assess, the prevention of trumped up or specious damage demands is less of an evidentiary concern because the nature and severity of the thought-based harm can also be readily apprehended by a layperson-juror.
This so-called Bystander Rule,[11] like the physical symptomatology overlay, is a judicially spawned temporal and spatial limitation on foreseeability and the character of the harm inflicted. The object of both — to put an outside limit on liability while allowing room for legitimate claims — is the same. The important difference between the two is that bystander analysis is founded purely in law and public policy while the physical symptomatology overlay is a value-based expedient lacking in scientific validity and one that admittedly carries a substantial risk of unjust results. Reilly, 547 A.2d at 894 (3-2 decision) (Fay, J., dissenting). Although it certainly is reasonable for a society to impose limitations on liability for certain injuries or claims, it is senseless to pretend that physical symptomatology somehow establishes a nexus between the negligent conduct and the psychic injury,[12] particularly where there is no scientific support for the notion that the symptoms of genuine emotional distress include objectively measurable physical effects. In truth, Rhode Island's physical symptomatology requirement adds little to principles of bystander liability except to deny redress to those individuals whose physical constitution is stronger than that of others or whose mental ailment is not one of those few for which the diagnostic criteria include physical signs. See Marchetti, 638 A.2d at 1047 (in which the Rhode Island Supreme Court found Thing, 771 P.2d at 814, to be persuasive).
The critical feature is found in the California model's treatment of the term "serious emotional distress." In Thing, the Supreme Court of California accepted that "serious mental distress may be found where a reasonable [person] normally constituted, would not be able to adequately cope with the mental distress engendered by the circumstances by the case." Thing, 771 P.2d at 830 n12 (citing Rodrigues v. State, 472 P.2d 509, 519-520 (Ha. 1970)). Thus, the California model meets the public policy objectives of limiting liability while minimizing the potential for underinclusion of legitimate claims.
It is in gauging the severity of the emotional distress by the presence of physical signs that Rhode Island departs from the California model. Although the Rhode Island Court has termed the physical symptomatology requirement as an essential element of an emotional distress claim, that requirement is not so much elemental as it is definitional. The essential element is serious emotional distress, and the physical symptomatolgy requirement is merely an attempt to provide more a practical understanding of what is meant by "serious." Therefore, in order for it to be "serious," Rhode Island requires that the emotional distress induce some physical symptom. Andrade v. Jamestown Housing Authority, et als,82 F.3d 1179 (D.R.I. 1996). In this way, Rhode Island has fallen into step with the once popular myth that extraordinary harm to the psyche ordinarily, if not necessarily, manifests itself physically. Notably, none of the cases suggests any medically based support for that proposition — much less argues its scientific validity. And, unfortunate as it may seem, there is no easy way out of defining serious emotional distress.
It is against this legal backdrop that this justice considers the defendants' contention that the physical symptomatology rule is applicable to all manner of thought-based suffering claims and should be applied in this negligence in the death of a fetus case.
 IV. Donna Fortes's Claims for Emotional Distress
Donna Fortes's claim for emotional distress has crystallized the inadequacies inherent in the administration of Rhode Island's physical symptomatology requirement. It also raises serious doubts that cases of negligence in the death of a fetus can be addressed in Rhode Island's existing framework for emotional distress claims.
It is undisputed that Donna Fortes did not suffer objectively measurable physical symptoms as a consequence of the emotional distress caused by the loss of her fetus. The record in the case shows that she nonetheless did suffer substantial distress which her mental health counselor characterized as a DSM IV diagnosis of 309.28 Adjustment Disorder.
The defendants contend that Donna Fortes's fetus was not viable and therefore not a person. They contend that the fetus, a fortiori, must have been the living tissue of the body of its mother, Donna Fortes, for the negligent or intentional tortious injury to which she has a legal cause of action the same as she has for a wrongful injury to any other part of her body. The defendants further contend that if the fetus were not viable, then Donna Fortes's recovery is necessarily limited to damages for bodily injury.[13] But, given the present state of the law in Rhode Island, if Donna Fortes is entitled to recover damages for bodily injury, then she is legally entitled to recover for the thought-based suffering and mental anguish[14] that she endured as a result of that injury without the necessity of proving physical symptomatology. See generally, discussion above. However perversely, though, if Donna Fortes's claim is to be viewed as one for emotional distress as opposed to one for mental anguish attendant to bodily injury, then Donna Fortes cannot recover for the same thought-based suffering and emotional turmoil she suffered as a consequence of the defendants' negligence for the simple reason that she cannot meet the physical symptomatology requirement that Rhode Island has so far imposed upon claims for negligent infliction of emotional distress. It is patently anomalous that Donna Fortes could recover for the mental anguish she suffered in losing that which is, for purposes of a personal injury action, relegated to the status of body tissue but could not recover for the same emotional suffering so long as the action is cast as one purely for emotional distress. Thus, the defendants urge that the Court reconcile this incongruity by concluding that the physical symptomatology overlay applies to all categories of thought-based suffering claims and, more specifically, applies to negligent stillborn cases regardless of whether the claim is one for bodily injury or whether for emotional distress.
At the outset, this justice rejects the defendants' argument that the physical symptomatology requirement applies to all categories of thought-based suffering claims. This justice likewise rejects the defendants' argument that the requirement should be applied in bodily injury-based claims where the fetus is viewed as the living tissue of its mother. Defendants' argument in this regard is not well grounded in the law and flies in the face of the vast majority of jurisdictions that allow recovery for mental suffering both in bodily injury claims and in claims brought over the invasion of some legal interest. At best, the defendants misconstrue the law they cite in support of their contention that the physical symptomatology requirement applies to bodily injury claims generally or even to a limited class of bodily injury claims, such as the loss of a fetus. This justice's search of the law has turned up nothing that would warrant a departure from the time-honored public policy that each individual should be fairly compensated for all losses suffered as a proximate result of another's negligence. Moreover, it is long settled in Rhode Island that mental suffering is an element of damages in bodily injury claims. Arlan, 478 A.2d at 976; DeSpirito, 227 A.2d at 782.
The immediate question presented is whether Rhode Island's physical symptomatology requirement for emotional distress claims should be extended to cases of negligence in the death of a fetus regardless of whether or not the fetus was viable. However, the farther reaching question is one of how Rhode Island's tort system should respond to the negligently caused death of a fetus.
The starting point must be the nature of the relationship between a mother and her unborn child. Rhode Island has already agreed that among relationships there is none closer than that of a mother and child. D'Ambra, 338 A.2d at 524. And, while various jurisdictions, notably Rhode Island, Massachusetts and Connecticut, may not regard a non-viable fetus as a "person" for purposes of a wrongful death action, there are no cases to be found in which the court discounts the special physical and emotional bond existing between a woman and her unborn child regardless of the fetus' age or developmental level. To a mother, from the time of conception, until the time when her child is born, that unborn child is both a life within her, as well as a part of her body. Modaber v. Kelley, 348 S.E.2d 233 (Va. 1986)
Thus, when it comes to the emotional relationship between a mother and her unborn child, society recognizes no distinction between a viable and non-viable fetus. Society does not expect the strength of an expectant mother's emotional bond to be conditioned upon viability. Nor does it expect the potential severity of her distress in losing the fetus to negligence to be related to the fetus' status for purposes of one legal claim versus another. It is the reality of the mother-child connection that reveals how artificial it is to attempt legally to fragment the concepts of pregnancy and the mother-child relationship. The reality of that connection likewise reveals how Rhode Island's existing concepts of recovery for bodily injury, wrongful death and bystander liability do not well respond to the negligently caused death of a fetus. (Compare, for example, Zavala v. Arce, 58 Cal.App.4th 915 (1997); Edinburg Hospital, 941 S.W.2d at 76; Krishnan v. Sepulveda, 916 S.W.2d 478 (Tx. 1995); Miccolis, 587 A.2d at 71; Carey v. Lovett et als, 622 A.2d 1279 (N.J. 1993); Burgess v. Gupta, 831 P.2d 1197 (Ca. 1992) and other cases dealing with negligence in the death of a fetus.)
In light of the foregoing, it seems appropriate to return to time-honored forseeability, causality, and public policy considerations in determining how the law should approach claims for the negligently caused death of a fetus and, too, whether the physical symptomatology overlay should be applied in cases of negligent loss of a fetus. Notwithstanding the Rhode Island Court's evident concern over traditional forseeability-based analysis in emotional distress claims, the Court has never entirely rejected such an approach but instead has viewed considerations of duty in the context of its grope for end-based limitations on liability. Marchetti, 638 A.2d at 1047; Reilly, 547 A.2d at 894; D'Ambra, 338 A.2d at 524. Furthermore, though it should not need to be said, in a negligent infliction of emotional distress claim, the claim is not an independent tort for emotional distress but is one for negligence. Burgess, 831 P.2d at 1197; Johnson v. Ruark Obstetrics and Gynecology Associates, P.A., 365 S.E.2d 909 (N.C. 1988). Thus, it is in the context of a conventional negligence framework that this justice should examine Donna Fortes's emotional distress claims. Banks v. Bowen's Landing Corp., 522 A.2d 1222 (R.I. 1987). And, given the Rhode Island Supreme Court's clear desire to impose reasonable constraints on liability in emotional distress claims, this justice should approach the question with an eye toward the different public policy considerations implicated by this claim. So, too, this justice must be mindful of problems in reliability of proof.
Fundamentally, the interest to be protected in non-parasitic, thought-based suffering claims is the right to remain free from negligently caused interference with one's peace of mind. Molien v. Kaiser Foundation Hospitals et al., 616 P.2d 813 (Ca. 1980); see Prosser Keeton, Torts, Ch. 2 § 12 Infliction of Mental Distress (5th ed. 1984). The considerations relevant in determining whether the defendants owed a duty of care to Donna Fortes in this regard are several. First, Donna Fortes and the defendants had previously entered into a special relationship of patient and physician. The object of that relationship was Fortes's pregnancy. That pregnancy and the very special emotional and physical relationship existing between a mother and her unborn child made the risk of mental distress readily foreseeable should some harm befall the pregnancy. And, given the circumstances inherent in a pregnancy, the unreasonableness of that risk and the potential severity of that harm were equally as predictable and palpable. Furthermore, there is no policy consideration weighing in favor of limiting liability where the causal connection is as direct as it is in the case of a physician whose negligence in treatment of a pregnancy causes the death of the fetus. Finally, the circumstances bear all of the hallmarks of genuineness and reliability of proof. Therefore, it is this justice's conclusion that in the context of her pregnancy, the defendants owed a duty to Donna Fortes to act with reasonable care in ensuring that their actions or their failure to act with respect to her unborn child would not cause her mental distress. That duty was a separate duty but one that ran parallel with their duty to use reasonable care with respect to the medical treatment they provided to her and her unborn child. Zavala, 58 Cal.App.4th at 915. The former duty is the duty to avoid causing Donna Fortes emotional distress by negligently harming her fetus. The latter is the duty to avoid negligently causing her and her fetus bodily harm. The two duties are inextricably intertwined, and the damages for breach are largely co-extensive.[15] It is this justice's conclusion that recognition of these parallel duties best responds to the unique circumstances surrounding a mother and her unborn child. A review of the operative complaint shows that Donna Fortes has made out allegations that are sufficient to constitute a cause of action for professional negligence and a related claim for emotional distress. Zavala, 58 Cal.App.4th at 915.
Having determined that two related but independent duties exist, the next question is whether to place liability limitations on the character of the emotional turmoil Fortes suffered. How severe must the turmoil be before it can be compensable? Should the physical symptomatology requirement be applied as a sine qua non of the severity of her distress? The defendants contend so and move for summary judgment on that ground.
It is this justice's conclusion that Donna Fortes need not prove her emotional distress to have been severe and that the physical symptomatology requirement is not applicable to her claim.
If one were to pretend that injury to her fetus is not a concomitant injury to Donna Fortes and consequently conclude that Fortes cannot recover damages for the pain and mental suffering ordinarily attendant to a bodily injury, then Fortes's recovery would necessarily be limited to a "pure" emotional distress claim — a claim that thus far in Rhode Island has carried with it the requirement that the distress be severe and manifested by physical symptoms. By confining their accountability to liability for only serious or severe emotional distress, the defendants would be permitted to escape liability for all of the natural and probable consequences of their actions. It would also exempt them from the time-honored principles that every person is responsible for the consequences of his or her wrongful conduct, and that a person harmed by another's negligence should be entitled to full redress for his or her injuries. Such an exception to liability is simply not supported by the public policy considerations implicated in this case. Furthermore, it would ignore the truth of the relationship between a mother and her unborn child, the parallel duties owed the mother, and the co-extensive nature of the damage claims.
Just as importantly, the circumstances carry overwhelming indicia that the claim is trustworthy so there is no need to impose a physical symptomatology requirement as an index of reliability. Emotional injury stemming from the death of a fetus occasioned by medical negligence will not often be specious. In cases of this kind, the injury to the mother is plain. Common experience tells us that the emotional injury is genuine and substantial. Certainly Donna Fortes must prove that she suffered substantial worry and stress beyond that normally attendant to pregnancy and childbirth — to require otherwise would subject the defendants to liability for something that their negligence did not proximately cause. However, there is no moral or legal justification in requiring her distress to have been severe or to have been manifested by physical symptoms before she can recover against the defendants for their negligence. It makes no sense that the law would allow her to recover for the emotional distress associated with, say, a temporary physical injury, a facial scar, and oil in her basement, or a false imprisonment, but not for the death of her fetus. Donna Fortes should be able to recover damages for the same spectrum of mental anguish that she could recover were she to have lost an eye or a limb to medical negligence.
For these reasons, the defendants' motion for summary judgment must be denied with respect to Donna Fortes's claims for negligent infliction of emotional distress.
 V. Antonio Fortes's Claims for Emotional Distress
Distilled, the defendants' arguments with respect to Antonio Fortes's claim for emotional distress are twofold. They contend that he cannot make out the essential criteria for a bystander liability-based emotional distress claim. Thus, they implicitly contend that they owed no duty to him. They also contend that he cannot show his emotional distress to have resulted in physical symptoms.
Whether or not the defendants owed a duty of care to Antonio Fortes is, of course, a question of law for the court. Burgess, 831 P.2d at 1197; Banks, 522 A.2d at 1222; D'Ambra, 338 A.2d at 524. It is this justice's conclusion that before the defendants can be said to owe a duty of care to Antonio Fortes, Fortes must meet the California-model bystander criteria. Burgess, 831 P.2d at 1197. While it is a foreseeable risk that medical malpractice resulting in injury to a person would cause severe emotional distress in another, policy considerations constrain this justice from extending liability that far unless the California-model bystander criteria are met. To do otherwise would create a near limitless class of potential plaintiffs, resulting in liability out of proportion to the moral culpability of physician defendants. It is for just that reason that courts have carefully circumscribed the class of bystanders to whom a defendant owes a duty to avoid inflicting emotional distress. Burgess, 831 P.2d at 1197. The remaining question is whether Fortes has come forward to demonstrate the existence of duty-triggering facts.
Although the record available for this justice's review is scant with respect to Antonio Fortes, it seems undisputed that whatever it was that he did observe was not a sudden and traumatic injury-producing event but was, instead, the progressive medical complications attendant to his wife's pregnancy and the untimely delivery of her fetus. True, the pleadings suggest that Antonio Fortes was present with or in the vicinity of his wife while she suffered through days of medical complications and the stillbirth of their unborn child. But, beyond that, the record fails to show that he was a percipient witness to the defendants' failure to act properly with respect to his wife's medical care or that he was aware, too, that their failure to act was causing injury to the fetus. And, significantly, Antonio Fortes does not contend that there was some form of prior relationship existing between him and the defendants — something that was critical to the question of whether the defendants owed a duty to Donna Fortes. Having been challenged by the defendants to come forward with some admissible evidence raising a genuine dispute of fact concerning the existence of duty-triggering facts, Antonio Fortes has failed to meet that challenge. See Routheir v. Gaudet, 689 A.2d 407 (R.I. 1997); Splendorio, et al v. Bilray Demolition Co., Inc. et al., 682 A.2d 461 (R.I. 1996); Grande v. Amaca's Inc.,623 A.2d 971 (R.I. 1993).
It is clear that Fortes cannot meet the contemporaneous observation requirement necessary to bystander liability and, absent that, this justice concludes the defendants owed him no duty of care. It is also undisputed that Antonio Fortes did not suffer any physical symptoms as a result of the fetus' death. Given the present state of Rhode Island law controlling bystander-based emotional distress claims, he is required to meet that requirement as well.
Accordingly, the defendants' motion for summary judgment concerning Antonio Fortes's claims must be granted.
 VI. Conclusion
The defendants' motion for summary judgment is granted in part and denied in part.
[1] Depending upon the point to be made, emotional distress claims have been characterized as first party versus third party, parasitic versus pure, and damage-based versus elemental. A discussion of the differences between the categories of claims or their fundamental nature is not essential to this decision.
[2] The Court, in D'Ambra v. U.S., 338 A.2d 524 (R.I. 1975), held that it is the "objective manifestation of an injury which is crucial, not whether the injury is, in conventional terms, physical or mental." Later, in Reilly, 547 A.2d at 894, the Court rejected the notion that emotional distress claims might be proved on the basis of a plaintiff's subjective testimony. Finally, the Court in Valinoto v. DiSandro,688 A.2d 830 (R.I. 1997), held that the plaintiff's failure to prove any objective symptoms of physical injury as manifestations of her mental anguish was fatal to her case. See also Andrade v. Jamestown Housing Authority et als, 82 F.3d 1179 (D.R.I. 1996).
[3] See American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders-IV. Washington, D.C.: APA, 4th ed. 1994. For example, according to the American Psychiatric Association, a diagnosis of 309.81 Post Traumatic Stress Disorder is medically supported by specifically defined diagnostic criteria that do not necessarily include objectively measurable physical symptomatology. Similarly, neither a diagnosis of 296.2x Major Depressive Episode or of 309.28 Adjustment Disorder, such as Donna Fortes may have suffered, requires a finding of physical symptoms. Nonetheless, these conditions are recognized by mental health professionals as diagnosable medical disorders. Furthermore, the APA's diagnostic criteria for determining whether psychological factors cause or affect a physical condition do not involve objective measurement. According to the APA, it is the temporal relationship between a "psychologically meaningful environmental stimuli" and the initiation or exacerbation of a specific physical condition that supports the causal connection between the psychic factor and its physical effect. Psychological factors affecting physical condition, DSM-IV, § 316, Washington, D.C.: APA, 4th ed. 1994.
Furthermore, medical science has come to understand that physical symptomatology of depression and stress disorders hides deep within the brain's functioning notwithstanding that it cannot be objectively measured. Experts do not yet understand precisely how or why one's neurotransmitters are affected by stress or emotion and perhaps never will but they are coming to realize that there is a physical effect on a molecular level. Menzey, G., Robbins, I., Usefulness and Validity of Post-traumatic Stress Disorder as a Psychiatric Category, BJM 2001; 323:561-563 (British Medical Journal); Uri Bergmann, Further Thoughts on Neurobiology of EMDR: The Role of the Cerebellum in Accelerated Information Procesing, Traumatology Volume VI, Issue 3, Article 4 (October, 2000); Uri Bergmann, Speculations on the Neurobiology of EMDR, Traumatology, Volume 4, Issue 1, Article 2 (1998); Charles R. Figley, Ph.D., Neurobiology, Treatment Innovations, and a Cyclone in the Cook Islands: Implications for Understanding and Treating PTSD, Traumatology, Volume 4, Issue 1, Article 4 (1998).
[4] Advances in research, improvements in education and diagnostic techniques, and heightened professional understanding of disease, in general, provide a sufficient basis for the treatment of trauma-induced mental distress as a compensable injury that is within the competence of the trier of fact to understand and evaluate. See generally Volume 1 Matthew Bender, Negligent Emotional Distress: Objective Symptomatoloty Requirement, Damages in Tort Actions, § 5.02 [2] (1997).
[5] To be sure, in cases where the bodily harm or exposure to a distressing event is said to have resulted in a serious and disabling emotional or mental condition generally recognized and diagnosed by psychiatric professionals, courts must necessarily require that the existence of the condition and the causal connection be established by expert medical testimony. For example, when the degree of psychic harm is alleged to rise to a level beyond the understanding of the ordinary person, such as would be in the case of Post Traumatic Stress Dis order, courts should require expert testimony. Both the medical nature of and effects of Post Traumatic Stress Disorder are outside the understanding of the ordinary person and the opinion of an expert becomes necessary to the fact finder's understanding of the nature of the condition and its effects. R.I. R.Evid. 702 and 703.
[6] Some of the authorities refer to damages for thought-based suffering as "parasitic" damages in that the right to recover them is dependent upon liability for another independent or separate tort that acts as host to the damage claims. Speiser et al, American Law of Torts § 16:1 (1983); Restatement (Second) Torts § 47 cmt. b (1965); see generally Volume 1 Matthew Bender, Negligent Emotional Distress: Objective Symptomatoloty Requirement, Damages in Tort Actions, § 5.01 (1997). As discussed herein, Rhode Island generally does not require physical symptomatology in cases where the emotional distress is parasitic.
[7] As set out in the Restatement (Second) Torts § 46 (1965), the elements of an intentional infliction of emotional distress claim require that the actor intentionally or recklessly engage in extreme and outrageous conduct and that the emotional distress, regardless of how it is characterized, be extreme. Restatement (Second) Torts § 46 cmts. j-k (1965).
[8] Speiser et al, American Law of Torts § 16:16 (1983).
[9] Restatement (Second) Torts § 46 cmt. j (1965).
[10] Rhode Island already makes use of pretrial evidentiary proceedings to determine whether a prima facie case for punitive damages can be made out. See Palmisano v. Toth, 624 A.2d 314 (R.I. 1993). Furthermore, Super. R. Civ. P. 50 and 56 (as amended September 5, 1995) are likewise available as tools for weeding out meritless claims. Restatement (Second) Torts § 46, cmt. h (1965). See Brink's v. City of New York,533 F. Supp. 1123 (1982). See also, Givens v. Hixson, 631 S.W.2d 263
(Ark. 1982).
[11] Adherence to early California model duty-triggering guidelines led to the development of what has become known as the Bystander Rule. While the Bystander Rule is certainly a legally defensible construct, its application has generated a certain amount of confusion by causing courts and commentators to believe they must distinguish between direct duty, third party victims and derivative claims. Burgess v. Gupta, 831 P.2d 1197
(Ca. 1992). Discussion of that topic is beyond the scope of this decision.
[12] D'Ambra, 338 A.2d at 524.
[13] Common sense tells us that Donna Fortes cannot be a bystander to her own bodily injury and, therefore, a negligence based bystander liability claim for emotional distress is simply inapplicable. And, even if it were applicable, Fortes has not suffered the requisite physical symptomatology. See also, Edinburg Hospital Authority d/b/a Edinburg General Hospital v. Trevino, 941 S.W.2d 76 (Tex. 1996); Sesma v. Cueto,129 Cal.App.3d 108 (1982). Likewise, she cannot recover by way of an action brought over the death of a person, Miccolis, 587 A.2d at 71.
[14] In the context of a bodily injury claim, Donna Fortes could be expected to recover for her self-described anguish, nervousness, worry, embarrassment, anxiety, grief, shock, disappointment, guilt, self blame, anger, sadness, futility, self doubt, inadequacy, humiliation and shame, fear of what the still birth may represent, frustration, despondency, melancholy, dejection, helplessness and so on. And, with the appropriate expert opinion, she could also recover for the other effects of any medically recognized disorder she suffered — notwithstanding her lack of physical symptoms. Regardless of how her distress is characterized and regardless of its severity, Donna Fortes would be entitled to recover for the mental anguish incident to the loss of her fetus and all that it represents — just as she would if she had, say, lost an eye or a limb or had suffered some other bodily harm as a consequence of medical malpractice. Fortes, however, could recover neither for lost society and companionship of her child, nor could she recover for the bereavement and mourning associated with the child's death. The trial justice would have to carefully caution the jury in this regard. Burgess v. Gupta, 831 P.2d at 1197.
[15] If the fetus were not viable, the damages to which Donna Fortes would be entitled to recover under a negligent inflectional of emotional distress theory run parallel to those she would be entitled to recover for mental anguish under a bodily injury claim. See n15. On the other hand, if the fetus were viable, the damages she would be entitled to recover under a negligent infliction of emotional distress theory would include, in addition to those she would be entitled to recover for mental anguish under a bodily injury claim, the mental suffering and bereavement occasioned by the death of her child. Those damages would likewise be in addition to any recovery to which she might be entitled under the Wrongful Death Act for lost society and companionship. The Wrongful Death Act does not provide for a beneficiary to recover mental anguish or emotional distress. G.L. 1956 § 10-7-1 et seq.